# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
No. 16-588V
**Filed: May 24, 2018**
(Not to be published)

```
* * * * * * * * * * * * * * * * * * * * * * * *
                                              *
TIMOTHY SELLING,                              *
                                              *
              Petitioner,                     *          Findings of Fact; Onset;
                                              *          Shoulder Pain after Flu
       v.                                     *          Vaccination.
                                              *
SECRETARY OF HEALTH                           *
AND HUMAN SERVICES,                           *
                                              *
              Respondent.                     *
                                              *
* * * * * * * * * * * * * * * * * * * * * * * *
```

*Maximillian J. Muller,* Muller Brazil, LLP, Dresher, PA, for Petitioner.
*Ryan D. Pyles and Jeffrey T. Sprague,* U.S. Department of Justice, Washington, DC, for Respondent.

### RULING ON ONSET[1]

**Oler**, Special Master:

On May 18, 2016, Timothy Selling ("Mr. Selling" or "Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] (the "Vaccine Act" or "Program"). The petition alleges that the influenza ("flu") vaccination Mr. Selling received on October 13, 2014 caused him to develop "left shoulder injuries" immediately after vaccination. Petition at 1.

During the pendency of this case, the Petitioner submitted two affidavits that he authored, along with an affidavit prepared by his wife. I held a hearing on April 4, 2018 in Washington,

---

[1] Because this unpublished ruling contains a reasoned explanation for the action in this case, I intend to post it on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). In accordance with Vaccine Rule 18(b), the parties have 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

D.C. to determine the date of onset of Mr. Selling's shoulder pain.  During this hearing, I heard testimony from Mr. Selling and Mrs. Nina Bloom-Selling by video teleconference ("VTC").

After carefully considering the testimony of the witnesses, the medical records, and affidavits, I find that Petitioner's shoulder pain began within 48 hours of his flu vaccination.

## I. Procedural History

### A.  *Special Processing Unit*

Based on the allegations raised in the petition, this case was initially assigned to the special processing unit ("SPU") to be overseen by Chief Special Master (CSM) Dorsey.  *See generally* SPU Initial Order, ECF No. 6.  Starting in August 2016 until March 2017, the parties attempted to informally resolve this case.  *See* ECF Nos. 9-10, 12-18, 20, 22-23.  On March 3, 2017, Respondent filed a status report stating that the parties' settlement positions remained divergent, and requesting a Rule 4(c) Report deadline be scheduled.  ECF No. 24.  In response, CSM Dorsey set further proceedings in this case (*see* ECF No. 25), and Respondent filed a Rule 4(c) Report on March 14, 2017 (*see* ECF No. 26).  In his Rule 4(c) Report, Respondent averred that this case was not appropriate for compensation under the terms of the Act (*see* ECF No. 26 at 1), arguing, among other things, that there are "no records substantiating that the onset of [P]etitioner's left shoulder symptoms began within forty-eight hours of vaccination" (*id*. at 5).

Petitioner filed an affidavit on March 27, 2017 (*see* Exhibit ("Ex.") 7, ECF No. 27 at 1), and CSM Dorsey held a Rule 5 status conference on April 13, 2017 (*see* minute entry of 4/13/2017).  During that Rule 5 conference, CSM Dorsey informed the parties that there appear to be gaps in the medical records pertaining to the onset of Petitioner's injuries.  Petitioner agreed to further investigate whether additional medical records exist, and whether additional documentary evidence, such as witness affidavits, should be filed in this case.  *See* Rule 5 Order, ECF No. 28.  In response, Petitioner filed an affidavit from his wife, Nina Bloom-Selling (Ex. 8), and his own supplemental affidavit (Ex. 9) on May 15, 2017.  *See* ECF No. 29.

On June 14, 2017, Respondent filed a status report stating the affidavits submitted on Petitioner's behalf (Exs. 8 and 9) did not change Respondent's view of this case, arguing that "the current record does not demonstrate by preponderant evidence that [P]etitioner sustained a vaccine-related injury, specifically SIRVA." ECF No. 31 at 1.  Respondent alerted the Court of Petitioner's request to have a fact hearing, but stated that the case should be dismissed without holding one.  *Id.*

### B.  *Proceedings after this Case was Reassigned to my Docket*

This case was transferred out of the SPU on June 26, 2017, and was reassigned to two other special masters (*see* ECF Nos. 32-35) before eventually being reassigned to my docket on December 1, 2017 (*see* ECF Nos. 36-37).  I issued a scheduling order on December 7, 2017, instructing Petitioner to file a status report notifying me how he wishes to proceed in this case.  *See* non-PDF Scheduling Order of 12/7/2017.  In response, Petitioner filed a status report on December 21, 2017, stating that the parties were still unable to reach a settlement agreement to

date, and that a fact hearing will be necessary in this case. ECF No. 38. Accordingly, a member of my staff reached out to both parties to schedule a fact hearing leading to the issuance of my Fact Hearing Scheduling Order on January 23, 2018. In this order, I set the in-person fact hearing date for April 4, 2018. ECF No. 39.

I held a status conference on February 14, 2018. Petitioner's counsel alerted me to Petitioner's inability to travel to Washington, D.C. for an in-person fact hearing due to his wife's poor health. *See* minute entry of 2/14/2018. As a result, I allowed Petitioner, his witness, and his counsel to appear via VTC from a location near their home in Scottsdale, Arizona. *See* non-PDF Scheduling Order of 3/1/2018.

I held a fact hearing on April 4, 2018. Petitioner and his wife testified via VTC regarding the onset of his symptoms after the October 13, 2014 flu vaccination. *See* minute entry of 4/4/2018. At the conclusion of the fact hearing, both parties informed me that they did not wish to file post-hearing briefs. Tr. at 66. Respondent's counsel requested that Petitioner file his mental health treatment records, as Petitioner discussed his vaccine-related injury with his therapist. Petitioner also noted that some of the physical therapy ("PT") records were missing from the record. I issued a scheduling order on April 5, 2018, ordering Petitioner to file the additional PT records as well as the mental health records discussed at the hearing. *See* ECF No. 41. Petitioner filed the requested documents on April 18, 2018[3] (*see* Exs. 10-11, ECF No. 42); he also filed an amended statement of completion on that same date (*see* ECF No. 43). This matter is now ripe for adjudication.

## II. Legal Standards Regarding Fact Finding

Petitioners bear the burden of establishing their claims by a preponderance of the evidence. 42 U.S.C. § 300aa-13(1)(a). A petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he or she] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).

In order to make a determination concerning factual issues, such as the timing of onset of petitioner's alleged injury, the special master should first look to the medical records. "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993); *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2006 WL 3734216, at *8 (Fed. Cl. Spec. Mstr. Nov. 29, 2006). Medical records created contemporaneously with the events they describe are

---

[3] Petitioner's mental health provider, Dr. Daniela Roher provided a one page summary of Mr. Selling's visits with her in lieu of submitting all of his mental health treatment records. In her cover letter to Petitioner's counsel, she wrote, "[d]uring our phone conversation, I expressed to you my serious reservations about releasing Mr. Selling's full records, due to the very private nature of my clinical notes. I suggested, instead, that I would write a detailed report of our work together, and you agreed to my suggestion." Ex. 11 at 2. As it does not appear that more detailed information about these sessions is pertinent to the issue of onset, I am satisfied with Dr. Roher's summary and do not require any further documentation from Petitioner on this point.

presumed to be accurate and complete.  *Doe/70 v. Sec'y of Health & Human Servs.,* 95 Fed. Cl. 598, 608 (2010).

Contemporaneous medical records generally merit greater evidentiary weight than oral testimony; this is particularly true where such testimony conflicts with the record evidence. *Cucuras*, 993 F.2d at 1528; *see also Murphy v. Sec'y of Health & Human Servs*., 23 Cl. Ct. 726, 733 (1991), *aff'd*, 968 F.2d 1226 (Fed. Cir.)(citing *United States v. United States Gypsum Co*., 333 U.S. 364, 396 (1947) ("[i]t has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight")).  "Written documentation recorded by a disinterested person at or soon after the event at issue is generally more reliable than the recollection of a party to a lawsuit many years later." *Reusser v. Sec'y of Health & Human Servs*., 28 Fed. Cl. 516, 523 (1993).

However, there are situations in which compelling oral testimony may be more persuasive than written records--for instance in cases where records are found to be incomplete or inaccurate.  *Campbell v. Sec'y of Health & Human Servs*., 69 Fed. Cl. 775, 779 (2006) ("like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking"); *Lowrie v. Sec'y of Health & Human Servs*., No. 03-1585V, 2005 WL 6117475, at *19 (Fed. Cl. Spec. Mstr. Dec. 12, 2005) ("[w]ritten records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent") (quoting *Murphy*, 23 Cl. Ct. at 733).

When witness testimony is used to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.*, No. 11-685V, 2013 WL 1880825, at *4 (Fed. Cl. Spec. Mstr. April 10, 2013)(citing *Blutstein v. Sec'y of Health & Human Servs*., No. 90-2808V, 1998 WL 408611, at *85 (Fed. Cl. Spec. Mstr. June 30, 1998)).  In determining the accuracy and completeness of medical records, the Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Human Servs*., 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014).  A special master making a determination whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony at a hearing must have evidence suggesting the decision was a rational determination. *Burns by Burns v. Sec'y of Health & Human Servs*., 3 F.3d 415, 417 (Fed. Cir. 1993).

### III. The Petition, Affidavits, Medical Records, and Testimony

The Petition filed in this matter states that Mr. Selling felt severe pain in his left shoulder immediately after receiving his flu vaccination on October 13, 2014.  Petition at p. 1.  He sought treatment to address his condition in 2014, throughout 2015 and into 2016.

### A.  Affidavits

#### 1.  Affidavit of Mr. Selling

In support of his Petition, Mr. Selling signed his first affidavit on March 24, 2017.  In this affidavit, he described feeling pain in his left shoulder the night of the vaccination.  Mr. Selling stated that he typically received a flu shot every year, and was familiar with the type of pain associated with a routine vaccination.  He described that his left shoulder gave him "significant problems" after the date of the vaccination.  He further averred that he had not sustained any other injury that would explain his symptoms.  Ex. 7 at 1.  Petitioner explained that he had not put it together that the vaccination on October 13, 2014 had caused his shoulder pain.

Mr. Selling also described a right shoulder injury from the mid-1980s that he sustained after exercising.  Since suffering this injury, Mr. Selling has experienced sporadic pain in the right shoulder ever since.  However, "[t]he right shoulder only causes discomfort infrequently, and resolves in a day or two on its own.  The left shoulder pain continued getting more and more intense in the months following vaccination, to the point of becoming debilitating." *Id.* at 2.

In December 2014, Petitioner told his doctors about the pain in his left shoulder.  In April or May 2015, he began to tell them about the right shoulder as well as the left.  "I figured since I was receiving treatment for my left shoulder injury, I might as well have them look at my right shoulder which had been giving me occasional issues for years." *Id.*

#### 2.  Supplemental Affidavit of Mr. Selling

On May 10, 2017, Petitioner signed his supplemental affidavit.  In this document, he provided additional detail about his right shoulder injury that he sustained around 1984 or 1985.  He tore his rotator cuff while exercising at a health club.  According to Mr. Selling, he went to a doctor one time concerning this injury; the doctor recommended physical therapy, he did the recommended exercises a couple of times and then stopped.  The shoulder healed, but remained "sensitive on occasion." Ex. 9 at 1.  "This has continued unchanged for the past 30 plus years and I never again sought treatment for the rotator cuff injury until 2015." *Id.*

When Petitioner decided to have Dr. Russo perform the manipulation of his left shoulder, Mr. Selling mentioned the occasional discomfort he felt in his right shoulder due to his old injury.  As Petitioner states, "[h]ad it not been for the vaccine injury, I would not have bothered with treatment for the right shoulder as it was a nuisance I'd lived with for 3 decades and was not a big deal." *Id.* at 2.

#### 3.  Affidavit of Mrs. Nina Bloom-Selling

Mrs. Nina Bloom-Selling, Petitioner's wife, signed her affidavit on May 10, 2017.  She states that Petitioner began experiencing pain in his left upper arm and shoulder "after the shot" which increased in intensity with time.  Ex. 8 at 1.  According to his wife, Petitioner did not like going to the doctor, and she had to convince him that his pain was not normal.  Mrs. Bloom-Selling described Petitioner's symptoms: "He was unable to get dressed and undressed

comfortably without my help." *Id.* at 2.  After his manipulation procedure and physical therapy Mrs. Bloom-Selling states that Petitioner's shoulder began to get better.  However, the pain came back, and "he had trouble moving his arm in some positions again." *Id.*

### B. Petitioner's Medical Records

Petitioner was born on October 17, 1958.  He was 55 years old on October 13, 2014, when he received the allegedly causal flu vaccine at Safeway Pharmacy located in Scottsdale, Arizona.

### 1. Petitioner's Medical History Prior to the Flu Vaccination

Petitioner had a history of hypercholesterolemia, anxiety, and tendonitis of the wrist.  Ex. 2 at 20.  As described in his affidavit and supplemental affidavit, Petitioner also suffered a right shoulder injury "in 1984 or '85", Ex. 7 at 2; Ex. 9 at 1, discussed *infra*.

On July 21, 2014, Petitioner visited Dr. Robert Bierman, his primary care physician. During this visit, Petitioner reported muscle and joint pain, and that he was "off red yeast rice due to myalgias." Ex. 2 at 21.  Petitioner explained during his testimony at hearing that the red yeast rice caused pain in his right shoulder.  Tr. at 45-46.  When he stopped taking the red yeast rice, the right shoulder pain went away almost immediately.  *Id.*

Petitioner visited Dr. Bierman again on September 23, 2014.  Ex. 2 at 19.  During this visit he reported "no joint pain." *Id.*  Further, under "physical exam" the notes indicate, "Musculoskeletal: Motor Strength and Tone: normal tone and motor strength.  Joints, Bones, and Muscles: normal movement of all extremities.  Extremities: no edema." *Id.*

### 2. The Flu Vaccination and Petitioner's Subsequent Medical History

Petitioner received his flu vaccination on October 13, 2014 in his left shoulder at a Safeway Pharmacy in Scottsdale, Arizona.  Ex. 1.  He next sought medical treatment on December 15, 2014 when he visited Dr. Bierman.  Ex. 2 at 15.  During this visit, Petitioner complained of pain in his left shoulder.  *Id.* at 17.  The medical records are silent as to when Petitioner's left shoulder pain began.  Dr. Bierman noted that Petitioner had a limited range of motion in his shoulder, with pain in the joint.  *Id.*  Dr. Bierman ordered an x-ray, and gave Petitioner an orthopedic referral.  *Id.* at 16-17.

On January 8, 2015, Petitioner visited OrthoArizona and saw Physician Assistant (PA) Jennifer Neil.  *Id.* at 41.  The patient notes for this visit detail that Mr. Selling was experiencing left shoulder pain that began "about 3 months ago."[4]  *Id.*  The notes further state that Petitioner at times feels the pain radiating down his left arm; and that he did not recall any specific injury.  *Id.* PA Neil indicated that Petitioner "can only tolerate actively abducting his shoulders 100º.… He does appear to have more rotator cuff strength on the right versus the left." *Id.* at 42.  PA Neil opined that Petitioner had some impingement of his left shoulder and that as a result, he

---

[4] Three months prior to this visit was October 8, 2014.

developed "mild frozen shoulder." *Id.* She gave Mr. Selling a steroid injection and recommended one month of physical therapy (PT) as well as a follow up appointment with Dr. Vincent Russo. *Id.*

Petitioner began treatment at Carefree Physical Therapy on March 16, 2015 and saw Nathan Miller, a physical therapist. Ex. 4 at 32. The notes from this initial evaluation indicate that Mr. Selling's left shoulder pain began "about 3-6 months ago with an insidious onset."[5] *Id.* The notes further indicate that Petitioner cannot sleep on his left side, move overhead, reach behind his back or use his left arm to open the car door without experiencing pain. *Id.* The injection he received in his shoulder from "about 1 month ago" resulted in no change in his symptoms. *Id.*

During his appointment with Dr. Bierman on April 14, 2015, Petitioner reported that he was having ongoing problems with both his right and left shoulders. Ex. 2 at 14. He stated that he has been seeing Dr. Russo at ortho and that physical therapy was providing "moderate" help to address his pain. *Id.*

On June 4, 2015, Petitioner returned to Dr. Russo for continuing left shoulder pain. Ex. 4 at 27. He was diagnosed with frozen shoulder and impingement syndrome. *Id.* at 28. During this visit, Petitioner also reported pain in his right shoulder and a "sensation of clunking and clicking with certain movements." *Id.* at 27. Dr. Russo ordered an MRI of both shoulders. *Id.*

Petitioner had this MRI on June 12, 2015. *Id.* at 23-26. The MRI of his left shoulder showed a "[s]mall sub-4 mm far anterior interstitial footprint tear approximating the articular surface and adjacent to the rotator interval capsule" with "[m]ild thickening and inflammation of the axillary pouch in keeping with mild adhesive capsulitis." *Id.* at 25. Dr. Russo suggested a manipulation with a steroid injection. *Id.* at 22.

On August 6, 2015, Petitioner underwent a manipulation of both shoulders under general anesthesia. *Id.* at 19. Dr. Russo diagnosed him with bilateral adhesive capsulitis, left more symptomatic than the right with rotator cuff tear, right shoulder. *Id.*

On August 12, 2015, Petitioner visited Dr. Russo for his initial postoperative appointment. Ex. 2 at 35. According to Dr. Russo, Petitioner "is doing well in his early postoperative course….His right shoulder doing better than the left, but that was the case preoperatively." *Id.* Dr. Russo further noted, "[o]n examination, he has full forward flexion and abduction bilaterally. There is still some minor tightness with external rotation left greater than right. He can internally rotate with both shoulders up to his shoulder blade." *Id.* Dr. Russo recommended continuing PT and taking Prilosec. *Id.*

Petitioner visited Dr. Russo on September 3, 2015 for a one month post-operative appointment. *Id.* at 32. According to Dr. Russo, "he is doing well in his early postoperative course particularly on the left side… [with] only a minimal lack of ER on the left otherwise excellent return to strength and mobility." *Id.*

---

[5] Three to six months before this visit represents a date range of September 16, 2014-December 16, 2014.

Petitioner returned to Carefree Physical Therapy on September 24, 2015 for his 17th physical therapy session.  Ex. 4 at 8.  During this visit, he still reported pain in the left shoulder with overhead stretching, and occasionally when sleeping on the left side.  *Id.* at 9.

On October 21, 2015 Petitioner saw Dr. Bierman for what appears to be a routine visit. Ex. 2 at 10.  Petitioner told Dr. Bierman that his shoulder is "better with recent manipulation" but that he is "still working out to build strength."  *Id.* at 11.

Petitioner returned to OrthoArizona on December 23, 2015.  *Id.* at 24.  According to Dr. Russo's history, "[a]pproximately 1 month ago he began noting some discomfort into his left shoulder particularly at night and particularly with internal rotation.…He is asymptomatic on the opposite shoulder."  *Id.*  Dr. Russo opined that Petitioner appeared to be experiencing a return of his adhesive capsulitis.  *Id.* at 25.  Dr. Russo provided Mr. Selling with a steroid injection into the posterior left shoulder capsule.  *Id.*

Petitioner followed up with Carefree Physical Therapy on December 29, 2015 where he complained of pain in his left shoulder "with reaching behind his back; reaching overhead; putting on clothes such as belts, tucking in his shirt, and putting on a coat; and pain with sleeping on the [left] side."  Ex. 4 at 4.  The treating therapist recommended PT two times per week for six weeks.  *Id.* at 6.

Petitioner visited Carefree Physical Therapy on January 27, 2016 and reported "that the shoulder is feeling very normal at this point in time."  Ex. 10 at 75.  Petitioner indicated that "he still had slight pain in the shoulder with reaching behind his back."  *Id.*  This represents the last PT visit documented in Petitioner's records.

### C. Testimony at the Hearing

#### 1. Testimony of Mr. Selling

Mr. Selling first described his right shoulder injury that he sustained sometime between 1983 and 1985.  He was using an exercise machine at the gym when he hurt his shoulder.  Tr. at 9.  After the injury, Petitioner went to see a doctor once or twice.  *Id.*  He did not receive any additional treatment for his right shoulder injury between 1986 and 2013.  *Id.*  Petitioner testified that he had never sustained an injury to his left shoulder prior to the vaccination at issue in this case.  *Id.*

Petitioner testified that he had received a flu vaccination every year for the past 20 years. Tr. at 10, 51.  He always receives the flu shot because he got very sick with the flu in the 1990s, and has been vaccinated ever since.  Tr. at 51.  He is familiar with the minor pain/soreness associated with these shots.  Tr. at 10.  Based on his past experience, any soreness that he experienced from the flu vaccination would go away in a couple of days.  *Id.*

Petitioner had intermittently taken red yeast rice as a natural remedy to lower his cholesterol.  Tr. at 45.  He testified that one of the side effects of red yeast rice is joint pain.  *Id.* When he saw Dr. Bierman in July of 2014, he had decided to stop taking the red yeast rice

because it was causing pain in his right shoulder.  *Id.*  The pain in his right shoulder was a dull aching pain.  Tr. at 53.  This pain was very different from the pain in his left shoulder, which Petitioner described as feeling "like having a knife jabbed into you...without seeing it coming."  Tr. at 24.  When Petitioner stopped taking the red yeast rice, the pain in his right shoulder went away within a couple of days.  Tr. at 54.

On October 13, 2014 Petitioner received his flu vaccination with his wife, Nina Bloom-Selling.  Ex. 1; Tr. at 11.  When he received the vaccination, it felt like "there was a little bit of a half balloon … under the skin.  And instead of getting better over two or three days, it just stayed there."  Tr. at 55.  As compared with his previous vaccinations, the pain after the October 13, 2014 flu shot was stronger and more intense.  Tr. at 55-56.  Also distinguishing was the fact that the pain from this flu shot never went away; instead it started getting worse.  Tr. at 12.  After a while, Petitioner testified that his shoulder became very uncomfortable and painful, to the point of restricting the movement of his left arm.  *Id.*  His wife kept asking him to go to the doctor; he kept telling her that it would go away.  *Id.*  Eventually, Petitioner testified that his shoulder pain got bad enough that he made an appointment to see his family doctor, Dr. Bierman.  *Id.*

Petitioner saw Dr. Bierman on December 15, 2014.  Tr. at 12-13.  Dr. Bierman tested the range of motion in his left shoulder and told Petitioner that he may have a frozen shoulder.  Tr. at 13.  Dr. Bierman also ordered x-rays of Mr. Selling's left shoulder.  *Id.*  Petitioner testified that it was very difficult for him to remove his shirt for the x-ray.  *Id.*  His wife had helped him get dressed that morning, and when he went to take off his T-shirt, it was very painful; in fact, he could barely remove the shirt himself.  *Id.*

Dr. Bierman gave him a referral to Dr. Russo, an orthopedist.  Tr. at 14-15.  Petitioner visited Dr. Russo's office on January 15, 2015 and saw his assistant.  Tr. at 15.  She concurred with Dr. Bierman that Petitioner had a frozen shoulder, and gave him a cortisone injection.  *Id.*  She also prescribed PT.  *Id.*

Petitioner testified that at this point, he did not know what was causing his pain.  *Id.*  For this reason, he did not mention anything to his providers about the flu shot.  *Id.*  Petitioner testified that he was focused on getting rid of the pain as opposed to what caused it in the first place.  Tr. at 16.  Petitioner's level of pain from December 2014 through January 2015 was between an 8 and a 10 when he moved his arm in a position that strained his shoulder.  Tr. at 17.  He described the pain as "relentless."  *Id.*

Petitioner started PT in March of 2015.  Ex. 4 at 32.  Between March and May of 2015, he went to PT two to three times each week.  Tr. at 18.  Petitioner testified that he also did home exercises every day, usually two times per day.  Tr. at 18-19.  The exercises were focused on improving his range of motion.  Tr. at 19.

Dr. Russo told Petitioner that he should consider undergoing a manipulation under general anesthetic.  Tr. at 23.  Petitioner talked to Dr. Russo about having the manipulation performed on both shoulders.  *Id.*  Petitioner explained his reasoning for addressing the right shoulder at the same time as the left: "if I'm going to be under general anesthesia, I figured that it would be best to have the right shoulder looked at as well so I wouldn't have to go through that

twice because it was getting worse with the right." *Id.* According to Mr. Selling, his right shoulder had not really given him any trouble since the 1980s. Tr. at 9. However, since his left shoulder pain developed, he had been using his right arm more, and also had to adjust the way he was sleeping. Tr. at 22. Petitioner believed that due to these factors, his right shoulder had started to hurt. *Id.* Because he was having the manipulation procedure anyway, Petitioner decided to have both shoulders addressed. Tr. at 23.

Dr. Russo performed the manipulation on August 6, 2015. Ex. 4 at 19; Tr. at 25. The day after the procedure, Petitioner had to start exercising his shoulder right away. Tr. at 26. He testified that the exercises were extremely painful. *Id.*

Although he had a recurrence of his left shoulder pain in December of 2015 (Tr. at 32), the pain in his left shoulder eventually went away. Tr. at 36. As of the beginning to the middle of 2017, Petitioner was totally pain-free in his left shoulder. *Id.* His shoulder remains pain-free to this date. Tr. at 37.

## 2. Testimony of Mrs. Nina Bloom-Selling

Mrs. Nina Bloom-Selling helps her husband with his private investigator business. Tr. at 59. She is also an artist. *Id.* She and the Petitioner have been married for 28 years. *Id.*

On October 13, 2014, she and the Petitioner both went to the Safeway Pharmacy to get their annual flu shot. Tr. at 60. They do this together each year. *Id.* Mrs. Selling testified that she had a little discomfort after her shot. *Id.* But as she described it, her husband had a lot of pain in his left shoulder and it kept getting worse. Tr. at 60-61. Petitioner is not one to see a doctor, and Mrs. Selling testified that she had to beg him to go in for treatment. Tr. at 60.

Mrs. Selling also testified about attending some of Petitioner's medical appointments and physical therapy sessions with him. Tr. at 61-62. She generally discussed Petitioner's shoulder pain, and how difficult his injury was for both of them. Tr. at 63-65.

## IV. Findings of Fact

The issue to be addressed is whether the onset of Petitioner's shoulder pain occurred within 48 hours of his vaccination. Petitioner has the burden of demonstrating the facts necessary for entitlement to an award by a preponderance of the evidence. § 300aa-12(a)(1)(A). Under that standard, the existence of a fact must be shown to be "more probable than its nonexistence." *In re Winship*, 397 U.S. 358, 371 (1970) (Harlan, J., concurring). In light of the witness testimony, medical records, and affidavits presented in this case, I find there is preponderant evidence that the onset of Petitioner's shoulder pain occurred within 48 hours of his October 13, 2014 flu vaccination.

In his affidavit and during his testimony at the hearing, Petitioner attests that he experienced pain the same day that he received his flu vaccination. I find his testimony on this point to be cogent and credible, and further find this testimony is corroborated by his statements

to two different medical providers, as well as the physical exams they conducted during his appointments, as documented in his medical records.

Petitioner's contemporaneous medical records demonstrate that he consistently placed the onset of his shoulder pain to the general timeframe of his vaccination. He told Dr. Russo his pain began "about three months ago", which would establish onset as around October 8, 2014, within five days of his vaccination. Further, on March 16, 2015, Petitioner told his physical therapist that his pain began "about 3-6 months ago." This establishes onset between September 16, 2014 and December 16, 2014.

In his affidavits and at the hearing, Petitioner testified that he did not know a vaccination could cause chronic and severe shoulder pain. He did not connect his vaccination with his shoulder injury until he learned of the association more than one year later. However, as the medical records demonstrate, Petitioner did experience left shoulder pain, and he did seek medical attention for this pain. It is common for petitioners not to equate the onset of shoulder pain to a vaccination unless there is an immediate severe level of pain upon administration. Under the circumstances of this case, I find Petitioner's estimates in the medical records to be reasonable, accurate, and consistent with his affidavits and testimony, which allege the onset of pain within 48 hours of vaccination.

Respondent contends that because Petitioner complained of symptoms in his right shoulder, that complaint "weighs against a finding of a causal association between petitioner's left shoulder pain specifically and vaccination." (Rule 4(c) Report, p. 5). I do not find this argument to be persuasive. Mr. Selling's explanation of his old right shoulder injury and his reason for addressing it with his doctor were credible. In my view, the existence of a right shoulder injury sustained decades ago is not relevant to Petitioner's left shoulder pain at issue in this case.

Similarly, Mr. Selling discussed the pain in his right shoulder that he attributed to red yeast rice. Petitioner testified and the medical records indicate that he reported this pain on July 21, 2014 (Ex. 2 at 21), and that it resolved "within a few days." Tr. at 46. In his testimony, Mr. Selling was able to distinguish the "dull aching pain" in his right shoulder that he attributed to the red yeast rice from the "sharp burning pain, like a knife being shoved into the joint" that he experienced after receiving his flu vaccination. Tr. at 53-54. I do not find that joint pain associated with red yeast rice has any bearing on the onset of Petitioner's left shoulder pain.

I find that the affidavits submitted by and on behalf of Petitioner, the testimony of Mr. Selling and Mrs. Nina Bloom-Selling, and the medical records filed in this case work in concert to provide preponderant evidence that Petitioner's shoulder pain began within 48 hours of his October 13, 2014 flu vaccination.

## V. Conclusion

I find that Petitioner began to experience shoulder pain within 48 hours of receiving his flu vaccination.

The following is therefore ORDERED:

By no later than July 23, 2018, Petitioner and Respondent shall file a joint status report updating me on their proposed next steps in the case based on the facts articulated in this ruling.

**IT IS SO ORDERED.**

<u>**s/Katherine E. Oler**</u>
Katherine E. Oler
Special Master